Our second case this morning is number 22, 1482, Purdue Pharma L.P. v. Collegium Pharmaceutical, Inc. Our first The case law doesn't demand Congress use any particular words. Your Honor, I believe it did, and I can give you some specific points in the legislative history. And what we have to evaluate is what was Congress' goal in enacting this statute. In all of this case law, if it were as simple, respectfully, as looking in the statute for a specific statement that Collegium and the Board are looking for, we would not have the extensive discourse that we have in the cases that evaluate what was Congress doing. In the words of Dolan, what are the purposes that a time limit is designed to serve? And in this case, we have a very long, lengthy period where Congress was drafting and ultimately enacting the American Vents Act against a backdrop of a loose standard that Congress did not like. It was not working. It's because they're frustrated that the process isn't going as quickly as they want it to, so they put in a time limit. What makes this time limit so much more special than the time limit you see in cases like Brock? Exactly, because this is not an ordinary deadline, this is not an ordinary time limit, this is not an ordinary statute. I'm not seeing it yet, so why not? And why not is because Congress set up a scheme here. It was enacting these new AIA patent review mechanisms, IPRs and PGRs, to work concurrently with district court litigation. And it had a system, it had an inter-parties re-examination system where it intended to do precisely that, but it saw how ineffective that was. It was impossible. It happened in PrimeSource, didn't it? In PrimeSource, Congress was frustrated by this lack of speed in the presidential action. Why isn't that the same? Why isn't that same as what we see here? In PrimeSource, which came from this court's trans-Pacific decision, there was actually a very limited issue there before the court, which was when the president acted... They involve the same statutory scheme, is my point. I'm just having a hard time understanding why the urgency here is different, the need to have quick action. By either the president or an agency, why it's so different here. What is it that makes you think IPRs are so much more special? I'll answer the trans-Pacific PrimeSource question and then also answer what's here. In trans-Pacific and the PrimeSource case, the president there actually did timely act within the period and envisioned a plan. The challenge was that the president later modified that plan outside the period, but the plan was consistent. This court said in these circumstances it was approving the fact that the president later modified the plan when it was both consistent with the initial plan and the initial plan contemplated modification. You're not really answering my question. My question is what makes the legislative history and the statutory scheme here so special? Notwithstanding the fact that Congress did not explicitly include any sort of consequences for failure to meet the timeline, that this is different and deserves different treatment than a case like the statutory scheme we see in RAW or trans-Pacific? Yes, Your Honor. Here we have Congress creating schemes where it is in the legislative history emphatic about the deadline. It is saying that these must be completed within the statutory period. But there are other remedies for failure to comply with the deadline, right? There could be a mandamus petition to force the agency to act within the timeline. It doesn't have to be that action later becomes ineffective. Your Honor, thank you for bringing up mandamus because that would not be a remedy that could all be reconciled with Congress' intent here. Mandamus and APA, because those were obviously available for inter-parties re-examinations that lingered and lingered. And that simply added months or years of delay. But with the inter-parties re-examination, there wasn't a specific standard. I forget what the language was, but expeditious or something like that, right? That's absolutely right, Your Honor. In this Court's decision in Ethicon, the standard is special dispatch. And this Court described it as a very heightened standard. It had to be extraordinary or accelerated movement. And that was not getting the agency to act. But if you have a specific time frame, which this statute has, why can't that be enforced by mandamus? Because the mandamus period, Your Honor, would add significantly more time to the time period that Congress envisioned. Because remember, in the statute... In the statute itself, Congress not only set a one-year time period, but Congress said it was going to grant two and only two exceptions. Congress did give an open-ended exception, which would be akin to this mandamus procedure that would take months or years on top of the one-year time period. But that was very limited by Congress. The only open-ended discretion it gave to the Board was in the very specific scenario of joinder. For other extensions, there has to be good cause, and Congress itself limited that to six months. I'm baffled. How is that a response to my suggestion that mandamus is an available remedy? Your Honor, I believe that mandamus petitions would ordinarily take longer than the six months that Congress itself contemplated as the outside maximum for an IPR. And the reason that Congress did that, the reason Congress both put in the one-year time period and the six-month extension and capped it, is because we know from the legislative history that Congress was very dissatisfied that these proceedings were not working. Interparties reexams, just like IPRs and PGRs... ...are intended to have a stopple effect. They are intended to have an effect on pending district court litigation. District courts routinely stay their cases so that they can see what the outcome is of an IPR or PGR. But just like in interparties reexams, when those lingered, we weren't having the effect of actually improving district court litigation. Even if we agree with you that Congress was very worried about the timing here and that's why it was enacting this one-year deadline, the case law still says that Congress has to impose some kind of consequence for failing to meet that. And even if we say that consequence doesn't have to be in the statute and we can look to the legislative history, have you cited anything in the legislative history that suggests that PTAB would lack authority after one year rather than they should just comply with them one year? To effectuate Congress's intent. No, I'm not going there. I understand what you think Congress's intent is. Even if I agree with you, I think the case law doesn't help you because it says even if Congress's intent is to speed things up, if they really want the agency to lose authority, they have to say so in fairly explicit language. And luckily for you, I'm a judge that believes in legislative history, so I'm allowing you to look at legislative history and tell me where Congress said the agency lacked authority after one year. Your Honor, the way I would answer the question is that the case law is clear. I understand what you're going to say. I'm going to take this answer as there is no explicit place in the legislative history that Congress said the agency would lack authority after a year. We have to agree with that, Your Honor. I'm not disputing that. But I respectfully would urge the Court that the test here is always to evaluate the text and the context of the statute and the legislative purpose and the goal. The goal here was to have effective IPRs and PGRs that will actually end with a reliable end date so that district courts can rely on them and Article III jurisdiction in those cases is not tied up so that there can actually be an estoppel effect, which only happens once there is a final written decision. And there is no indication in the legislative history that Congress contemplated going back to what we already had, which was a real strong message to act quickly and the only recourse being the mandamus petitions or APA review. That is the reading that the Board adopted, and if this Court were to adopt it here, we can see what would happen because it happened in this case. Once the Board decided that it had discretion, this case took 19 and a half more months, well beyond the initial period that Congress contemplated. Again, putting it squarely in that time period that Congress said we're not satisfied with and we are changing. And on these facts, with this legislative history, with the prior scheme that Congress was replacing, it is clear that Congress wanted these proceedings to end. Otherwise, this entire scheme wouldn't work and we're back to where we started. And we always take into account when Congress replaces statutory language with other language. I see my time is just about up, but if I could just very briefly touch on written description. I'll give you a minute or so. That's all I need, Your Honor, because while we think that a final written decision is invalid and not before the Court, the patent is valid. The Board here measured written description by the distance between disclosures, and that is not a valid way to evaluate a patent specification. Our patent is well organized, coherent, broken down into sections, and it goes through aversive agents, specifying that gelling agents are aversive agents, then specifying surfactants as one of three categories in that list that the patent, that's in column six and seven, and then in column 28, repeats those same three categories and lists PGGs as the third listed type. PGG is a surfactant, but not all surfactants are gelling agents, right? Yes, Your Honor, but on the specification here in the four corners of the patent, by tracing through a person of ordinary skill in the art, frankly, any reader would appreciate that the patent is expressly disclosing PGGs as surfactants to be used, and this is important in column 28. It specifically says that these surfactants, including PGGs, are useful in accordance with the present invention, and with the logical sequential disclosures from column six and seven to 28, and the way the patent is organized, that is how a person of ordinary skill in the art would read it. They would not simply look at 20 or so columns in between and think this somehow can't be related. Respectfully, the Board just applied a legally erroneous, overly superficial analysis of the patent document. Okay, all right, we'll give you two minutes for rebuttal. Ms. Rashid? May it please the Court? Let's start with the availability. I look at this record, and I scratch my head, why it took so long to get this decision out, because if I recall correctly, the bankruptcy was initiated only like 10 days before the end of the one-year period, and then after it was permissible for the Board to go ahead and address this, it took another 19 months to get the decision out. Why did this happen? Part of the reason is because, Your Honor, the stay was still in place after the deadline passed. The stay wasn't lifted until four months later, and at that point, Purdue had introduced its brand new argument that somehow the entire proceeding just disappeared. It was 19 months after the stay was lifted, right, that the decision came out? This was an issue of first impression for the Board. It involved very important issues about the application of the automatic stay. These aren't issues that are necessarily in the wheelhouse of PTAB judges, and it involves very complicated issues about whether or not this is a governmental action or not, whether the agency is exercising its regulatory powers or its police powers. There are a lot of unanswered questions posed to real estate, so this is not something that the agency could have resolved on its own. I mean, really. I don't think the agency looks great. That doesn't mean that under the case law that it loses the authority, but it doesn't look good. You know, the other thing here is because this thing was pending for so long, the panels were changed twice because APJs had left the agency, and so that also required those APJs to then come on board and familiarize themselves with this case and to make sure that they're on board with the decision that was going to go out. That's another explanation. What action had to be undertaken to lift the stay? I mean, what action had to be undertaken to lift the stay? Was it that there was a stay and then the agency, you know, was not keeping track of what was happening with the bankruptcy proceeding, and so it was incumbent upon the parties to bring this to the attention of the agency? The APJs here were keeping track. They were keeping in touch with the parties. They asked the parties to approach the bankruptcy court to get resolution on either lifting the stay or, you know, getting a decision on whether or not the stay applied. They asked the parties to approach the bankruptcy court with those questions. They asked them to check in with the APJs. They had a hearing before the deadline expired, the 18-month deadline expired. And then the parties didn't do that? And the parties didn't do that until after the expiration of the deadline, unfortunately, in this case. Going to whether or not there are less drastic measures available, I'm surprised to hear... I'm not sure that I understand that. Surely the PTL was aware when the stay was lifted, right? They were aware when the stay was lifted, but what they were facing was an argument that the agency didn't even have jurisdiction to do anything at that point, that the agency was stripped of its authority to issue a final written decision. So they needed to resolve that predicate question before they could issue the final written decision. I think that is really what the holdup here was. During that time, Purdue could have sought mandamus relief from this court. Brock points to the availability of APA review under Section 706. One, this court's decision in rape paralyzed veteran provides for the same relief. And I don't understand why it would have taken so long. The relief requested is simply to issue a decision that's been unreasonably delayed, not a decision on the merits, nothing else that would take an extremely long time for this court to decide. So I do think that that is relevant here. But if we read this statute as not taking away your authority after 12 months, and mandamus has to be based upon unreasonable delay, wouldn't that allow the board to routinely blow by the 12 months time period? Because unreasonable delay I assume is not going to be 13 months, or 14 months even. And so then it gives the agency the authority to kind of just ignore what Congress said about the 12 months. Now I know your answer is you're not going to do that, and you have a history of not doing that. But I worry if we give you that explicit authority to say you can go past 12 months, that it's going to be abused. And how would that be remedied? We already treat this deadline as mandatory. This is a mandatory deadline. You're not asking us in a mandamus proceeding to say that you get more than 12 months subject to the statutory exceptions, right? It depends on the circumstances as to why it was delayed. Look, they viewed the deadline as important. They said 12 months, a couple of exceptions. If you don't comply with it, you know. We don't disagree that the deadlines are important. If you don't comply with the deadlines, you could be mandamus, right? It's not a question of unreasonable delay. It's a question of you didn't comply with the statute. That's right. The statute is mandatory. We believe the deadlines to be mandatory. And so there is a legal consequence. We could issue an order telling you to decide it, right? In a mandamus proceeding, if you go beyond 12 months and the exceptions don't apply, the court should issue an order telling you to decide it right away, right? I think it would depend on the circumstances, whether the delay was unreasonable or not. That hurts your argument. I don't know if one day post the 12-month deadline that that would be considered unreasonable delay. If you go beyond the one-year deadline, why are you not subject to an order of mandamus to go ahead and decide it right away? If Congress thought the deadline took precedence over the ability to issue the decision, they should have said so in the statute. But they did not provide for the agency to lose jurisdiction. You're mixing up two things. The question is, what consequences flow from the failure to achieve the deadline? And cases seem to suggest, no, you don't lose the authority, but that has nothing to do with your authority to exceed the deadline in a mandamus proceeding. I simply do not understand your argument that you can only get mandamus if there's an unreasonable delay beyond the one-year period. That to me makes no sense. Under 706.1, it's either if the decision is unlawfully withheld, and it wouldn't be unlawful here. It's unlawfully withheld once you go past the one-year deadline, save for the exceptions. It's a mandatory deadline. We don't disagree with you on that. The question is, what is the consequence of missing the deadline? Does that mean that the agency no longer has the authority to issue that decision? No, that's not what we've been talking about. I've been talking about a mandamus proceeding. And I'm suggesting to you that if you go one day past the one-year deadline, that mandamus is available. And you're somehow suggesting, oh no, the delay has to be unreasonable, or it depends on the circumstances. It doesn't depend on the circumstances. The statute says a year. If you don't do it in a year, you get mandamus. The history of the precedent, both before the Supreme Court and this Court, takes into consideration the reasons, the circumstances surrounding the delay. And that's important. Not if it's a mandatory requirement that you do it in a year. In those cases, the rules were also mandatory. This is kind of a hypothetical that's being asked right now about the procedure to mandamus. The argument is this, is that one thing that supports the idea that this is not a requirement to issue a decision outside the year time period, is that somebody who was in a circumstance where they hadn't received a decision within so much time could come to this Court and seek a petition for bidding mandamus. And so if they could seek a petition for mandamus, that means the statute isn't without teeth, if you will. But there is some consequence. So that's what these questions are going to. And so what is the PTO's view on whether a party could seek a petition for bidding mandamus if they hadn't received a decision from the PTO within the year timeline and hadn't sought an extension? No extension has been sought. I believe that they could seek a writ of mandamus, but I think the only relief that they can get is an order from this Court asking the agency to act. That's the only thing that's available. That's the only thing a writ of mandamus can give anybody. That's right. Let's talk about the exceptions. This case is exactly like Barnhart. Barnhart, Perdue's reasoning here suffers from  in footnote 7 of Barnhart. The exceptions don't create the rule. Yes, to the extent that these are exceptions, they don't suggest that what Congress was intending to do was to strip the agency of the authority to issue that decision. And so I think these exceptions should really just be understood as a series of deadlines based on certain circumstances. Even if there is an inference from these exceptions that Congress intended to do something like that, you still have to take it into consideration. It's still just an inference. You still have to take it into consideration the entire context of the statute and other provisions in the statute. And here you've got 328A, which requires the agency to issue a final written decision if the proceeding has been instituted and it has not been dismissed. That is relevant here, and it's been relevant in some of these other Supreme Court cases where there is another provision that requires the agency to act. And we have that here. I see I'm out of my time, but I just wanted to make a couple of more points if that's okay. It doesn't seem like Perdue's relying on the not later than language anymore, and I don't think that's persuasive at all because a lot of these cases use the same language. The AIA is replete with not later than language, and that's just not sufficient to create a jurisdictional bar. And finally, I think the reason for the delay is important because in every single one of these cases, it doesn't justify the delay necessarily, but it helps explain what the most natural reading of the statute should be. In Barnhart, the Supreme Court said that the goal of the statute was to allocate the greatest number of beneficiaries. I think we're pretty familiar with Barnhart. I think we're out of time. Okay, thank you, Your Honor. Mr. Pinnis? May it please the Court, Chris Pinnis from the Robbins Capital Law Firm on behalf of the Appellee Collegium Pharmaceutical. I want to pick up where my colleague from the Solicitor's Office left off, which is on the issue of why the Board has statutory authority to issue its final written description. We've heard a lot about the authority issue, and we've heard almost nothing about the written description issue. And since you're representing the private party, can you tell us what's the substantial evidence for lack of written description here? Because I see your friend's argument that this is a big patent that's organized, and a skilled artisan might look and pick one thing from here, one thing from here, one thing from here. The Board disagreed and found lack of written description. I always struggle with what's substantial evidence for a finding of lack of written description. What is it here? Yes, Judge Hughes, I will walk through two of them in particular that will get you to why the substantial evidence supports the lack of written description finding. The first is that the substantial evidence supports the Board's conclusion that PGGs are not gelling agents. And now that's important because if PGGs aren't gelling agents, Purdue's entire written description argument falls apart. And the Board's conclusion, I'll give you the conclusion and then the evidence that supports that. The Board's specification contemplates or adequately discloses that PGGs can be used as a gelling agent in the claim dosage form. Now that was at Appendix number 37. The substantial evidence that supports that, there's several. It is from Kleygian's expert who said that 961 patent described nowhere that PGGs are gelling agents. That's at Appendix 3352, paragraph 22. Kleygian's expert saying that he is unaware of any literature outside of the patent that describes PGGs as gelling agents. That is the same Appendix number, paragraph 24. Contrast that with Purdue's expert, Dr. Constantinides, who said he agreed the 961 patent does not describe PGGs as gelling agents. That's at Appendix 3184, Deposition Site 8587-15. And that their expert, this is Dr. Constantinides, Purdue's expert, cite no literature anywhere on the record for his conclusion that PGGs can be gelling agents. And that is at Appendix 3183, Deposition Sites 758-15. So the substantial evidence is replete throughout the record. And there is substantial evidence. And in fact, the board said in reference to Purdue's expert, Dr. Constantinides' testimony on this point, that being PGGs as gelling agents, is unsupported and entitled to little weight. And that's at Appendix number 38. So we think there's plenty of substantial evidence for this panel to find that PGGs are not gelling agents. And that can end the board's inquiry. And you can just see why you can affirm the board's lack of written description finding. Even if you were to find that PGGs are gelling agents, and again, substantial evidence that I just went through supports that they're not. But even if you were to find PGGs are gelling agents, there's also substantial evidence in the record to support the board's finding that Purdue is not in possession of an abuse deterrent dosage form with the recited combination of pharmaceutical ingredients with the claimed functionality. And that's at Appendix number 32 from the board. It's only with the benefit of hindsight that Purdue asks you to sort of jump through the specification, use it like a hopscotch grid to arrive at what they recite as the claimed invention. But your honors, respectfully, this is, in our opinion, a rushing no-bozine case. Purdue improperly disclosed a specification but provided no blaze marks or opposed it to identify what would later become the claimed combination. Now, your honors, I see I still have time. If you would like me to address the statutory question, I will. Otherwise, I will sit down if you don't have any other questions. I think we're done. Thank you. Thank you. Okay. Suzy, you've got two minutes. Thank you for the additional time. On the timing of the final written decision, the PTO's arguments prove our point. The PTO is offering to this court that things like additional briefing or panel change orders are going to be enough to blow past Congress's deadline. If that's your view of what is an unusual circumstance to go beyond the date, we're looking at any situation that would satisfy that and tie up this court with mandamus petitions or district courts with APA review. That, again, is not reconcilable with the path that Congress took here, which was not the ordinary course, but setting up a scheme that had to work effectively and expeditiously so that it could work concurrently with district court litigation. That is the consequence here. It's not that we come up with a super-valid patent or Collegium can't raise its arguments. We just go back to the pending district court case that we've been trying to litigate since 2017. Second, the real reason we're here, and this was touched on, the bankruptcy stay. When we told the board about that, Collegium disputed it, and the board was very clear, and this is at Appendix 868, that Collegium should go seek relief. That was the entire purpose of the six-month stay. It has nothing to do with Congress's intent that we're here. It has nothing to do with the bankruptcy laws, but Collegium did not act. It was specifically told by the board that it could take steps. It didn't meet our agreement. It ultimately got the stay lifted without our agreement. Finally, with respect to written description, Collegium's arguments there were rejected by the board in terms of PGGs as gelling agents. The board, in the enablement analysis at Appendix 48 to 53, clearly credited our expert as testifying that a person of ordinary skill in the art would recognize PGGs as gelling agents. If the court has no further questions, I would ask the court to die. Thank you, Ms. Rizzi. Thank all counsel in case of submission.